MURRAY SCHWARTZ, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; FREDERICK H. and DIANA C. PRINCE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schwartz v. Commissioner
Docket Nos. 6530-82; 11788-82.
United States Tax Court
T.C. Memo 1987-381; 1987 Tax Ct. Memo LEXIS 379; 54 T.C.M. (CCH) 11; T.C.M. (RIA) 87381; August 4, 1987. Jerome R. Rosenberg and Robert A. Sternbach, for the petitioners. Donna Epstein, Frances Ferrito Regan, and Anne Hintermeister, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Docket No.
Year
Deficiency
6530-82
1975
$ 15,149.45
11788-82
1976
$ 19,507.00
The issues for decision are: (1) Whether petitioners are entitled to an investment tax credit, amortization deductions, interest deductions, and other miscellaneous deductions as of result of the investment by the partnership Hampton Associates in the film "A Matter of Time;" (2) Whether petitioners may deduct amounts pursuant to production service agreements entered into by the partnership Hampton Associates; and (3) Whether petitioners are liable for additional interest under section 6621(c). [1] *384 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Murray Schwartz resided in Encino, California at the time of the filing of his petition in this case. Petitioners Frederick and Diana Prince, husband and wife, resided in Chicago, Illinois at the time of the filing of their petition in this case. Hampton Associates 1975
Hampton Associates 1975 (the Partnership) was organized as a limited partnership under the laws of the state of New York on or about August 13, 1975. The partnership agreement and articles of limited partnership were signed by the general partner, Everett Rosenthal (Rosenthal), and the two Class A limited partners, Daniel Glass (Glass) and Stephen Sharmat (Sharmat), *385 on August 13, 1975. The Partnership issued a private placement memorandum dated October 10, 1975. The stated purpose of the Partnership was to provide production services necessary to manufacture motion pictures for others, and to purchase and exploit feature motion pictures for its own account. The film "A Matter of Time" was identified as a film which would be purchased and exploited by the Partnership. On December 30, 1975, Rosenthal contributed $ 14,000 in cash to the Partnership and Glass and Sharmat each contributed $ 500 in cash. The 26 limited partners became partners on the date each signed the Class B limited partner signature page of the limited partnership agreement. The Class B limited partners contributed a total of $ 2,902,500 to the capital of the Partnership. The Class B limited partners contributed cash in the amount of $ 1,142,111.12 on or about the time of their admittance to the Partnership, with the balance of their capital contributions secured by irrevocable letters of credit in favor of the Partnership. The Class B limited partners were to be allocated 91 percent of the net cash-flow of the Partnership until their capital contributions were recouped, *386 at which time the allocation was to drop to 73 percent. The balance of net cash-flow was allocated one-third to the general and one-third to each of the Class A limited partners. Fixed payments to the general partner and Class A limited partners were to be made as follows: The General Partner and Class A Limited Partners will be paid an initial fee of $ 582,875 from which they must pay various expenses and fees incurred or to be incurred in connection with establishing and administering the Partnership, negotitating contracts covering the Partnership's initial projects and this private placement, including legal and accounting fees; fees and expenses of discounting letters of credit; and selling fees which may be paid to others assisting in the sale of Units. The balance will be retained by the General Partner and the Class A Limited Partners as compensation for services rendered to the Partnership. In addition, the General Partner and Class A Limited Partners will be paid fees aggregating $ 108,202 from the budgets of the three motion picture films for which the Partnership has agreed to provide production services, as herein described. The partnership Hillcrest Investors Co. *387 (Hillcrest) became a Class B limited partner in the Partnership on or about December 31, 1975. Petitioner Murray Schwartz executed a subscription agreement to become a limited partner in Hillcrest in a document dated December 23, 1975. Petitioner Frederick Prince executed a subscription agreement to become a limited partner in Hillcrest in a document dated December 26, 1975. Petitioner Schwartz contributed cash to Hillcrest in the amount of $ 12,116.67 on December 31, 1975, and obtained two irrevocable letters of credit from Irving Trust Company dated January 12, 1976, in the amounts of $ 10,000 and $ 8,333.33, for the benefit of the Partnership. Petitioner Prince contributed cash to Hillcrest in the amount of $ 6,058.33 on December 30, 1975, and obtained two irrevocable letters of credit from Morgan Guaranty Trust Company dated December 29, 1975, in the amounts of $ 5,000 and $ 4,166.67, for the benefit of the Partnership. The General Partner and Class A Limited Partners
Rosenthal has 35 years of experience in the entertainment field, principally in radio, television, and motion pictures. He has produced a number of motion pictures, including "I Never Sang With My Father, *388 " with Gene Hackman and Melvyn Douglas, for Columbia Pictures. He has also produced television shows such as "The Big Story" for NBC, and an award-winning series called "Treasury Men in Action." He has produced over 300 television episodes. In the mid 1970's, Rosenthal was president of FRP Productions, whose business was providing production services and offering completion bonds to producers, studios and networks. FRP Productions performed production services for such major studios and networks as Columbia Pictures, Universal Pictures, Paramount Pictures, CBS, NBC, and Warner Brothers. FRP Productions lent its expertise to producers who were not familiar with making pictures in the New York area. The company availed its clients of its union contracts in the New York area, made arrangements with the city for locations and permits, provided studio staging facilities, offered arrangements with labs where the film was to be developed, and arranged for the services of prop and costume companies. In addition, FRP Productions would examine the script and the budget of a production, and would then check against the shooting schedule to make sure that the cost projections in the budget *389 were consistent with the script and the shooting schedule. FRP Productions also provided payroll services for the producer, arranged for insurance for the producer, and paid taxes for the producer. Glass has been practicing law for 38 years, beginning his practice in the entertainment law field in 1947 working for the law firm of Phillips, Nizer, Benjamin & Kirm. Phillips, Nizer, Benjamin & Krim was involved in all activities relating to the motion picture and television fields and the theatre, including the representation of producers, distributors, writers, directors, and performers. Glass negotiated agreements with casts and directors, and negotiated distribution agreements, financing agreements, and acquisition agreements. He was also familiar with motion picture budgets. Thereafter, Glass was employed as general counsel and business manager of the television subsidiary of Columbia Pictures, then known as Screen Gems. At Screen Gems, Glass negotiated most of the deals and supervised the preparation of the documentation. He was also involved in the purchase and sale of motion pictures. Glass is now a senior partner in the law firm of Midgal, Tenney, Glass & Pollack, which *390 has a general commercial practice. [2]
Sharmat has been involved in over 400 plays, movies, and television shows. He has assisted in arranging financing for such pictures as "War Games," "Arthur," "Superman," "The Year of Living Dangerously," and "Love at First Bite." Sharmat has produced Broadway shows, including "Follies Bergeres" and "African Queen," and "Ides of March" in London. He also produced the motion picture "The Earthling." Sharmat has taught film classes at U.C.L.A. and U.S.C., and has lectured on film for the Director's Guild of America. The areas of his expertise are film packaging and finance. Sharmat has been involved with Glass in the financing or acquisition of many successful films. In their first partnership, Glass and Sharmat arranged the financing for "Cooley High," a successful picture which became a television series for a number of years on the ABC television network. When Sharmat and Glass worked together, Sharmat's job was primarily to find the right projects, to read scripts for those projects, and to analyze the elements of the script and the *391 people involved with the script. Sharmat would also work with investors who might be willing to finance the project. A Matter of Time
The cast of "A Matter of Time" included Liza Minnelli, Ingrid Bergman, and Charles Boyer. The director was Vincente Minnelli, an Academy Award-winning director. The screenplay for the picture was by John Gay, a well-known screenwriter. In the summer of 1974, the owner of the project was General International Film Co. (GIF), the principals of which were Jack H. Skirball, J. Edmund Grainger, and Vincente Minnelli. Jack H. Skirball and J. Edmund Grainger were long-time, well-known Hollywood producers. GIF owned the motion picture rights to the novel on which the film was based, "The Film of Memory" by Maurice Druon, and owned the motion picture rights to the screenplays based on the novel by Frederic Raphael and John Gay. Glass became directly involved in the negotiations regarding the project in August 1974. The project was originally to be a co-production between the Italian film company Oceania Produzioni International Cinematografiche S.r.l. (Oceania), the American distribution company K-Tel International, Inc., and outside investors *392 who were to invest 20 percent of the budgeted cost of the project in cash in return for an ownership interest in the project and a participation in the net profits of the picture. American International Pictures (AIP) first became involved in the project as an American financing source some time around March 1975. AIP later acquired worldwide distribution rights to the picture, and subdistributed foreign rights to Oceania. Distribution Agreement
GIF, Oceania, and American International Productions (Productions), a subsidiary of AIP, entered into a production-distribution agreement with respect to "A Matter of Time" (the production-distribution agreement). This agreement provided that GIF, as producer, would deliver to Productions the film and all rights in the film. The production-distribution agreement provided AIP with exclusive rights to distribute the film domestically [3] in perpetuity and provided Oceania with the exclusive rights to distribute the film in foreign markets. [4] [same] The actual grant of rights stated as follows: 4.1 [GIF] does hereby give, grant, assign and set over unto [Productions] and [Productions] gives, grants, assigns and sets over *393 unto [AIP] the sole, exclusive and irrevocable right, license and privilege under copyright to rent, lease, license, exhibit, distribute, reissue, deal in and with respect to the Picture and prints or any part thereof, and trailers thereof, and to license others to do so, in standard gauges, theatrically and non-theatrically, and by means of television in all forms, whether now known or hereafter to be known, and by means of wire, cartridges, cassettes and any and all other means of projection, transmission, broadcasting and exhibition, as hereinafter more fully set forth, throughout the entire world ("licensed territory"), in perpetuity. * * * 4.3 [AIP] does hereby grant, assign and sets over unto OCEANIA in the foriegn territory, all of the rights described in paragraph 4.1, hereof. The production-distribution agreement provided that AIP was to receive the *394 following as distribution fees: (1) 30 percent of the first $ 2,000,000 of domestic theatrical gross receipts and 40 percent of domestic theatrical gross receipts in excess of $ 2,000,000; (2) 25 percent of domestic network television receipts; (3) 35 percent of other net domestic television receipts; (4) 15 percent of miscellaneous domestic gross receipts other than music publishing, and (5) 50 percent of domestic music publishing receipts to go to AIP's music company, with the balance of such receipts to be included in gross receipts without being subject to any additional distribution fee. Oceania's distribution fees from foreign gross receipts were not to exceed the lesser of (1) 15 percent of net foreign theatrical receipts, or (2) 40 percent of gross receipts in Italy and 50 percent of gross receipts from all other foreign countries (with certain exceptions), 25 percent of net television receipts, and 15 percent of miscellaneous receipts other than music publishing, of which Oceania's publishing company was to retain 50 percent with the balance of such receipts to be included in gross receipts without being subject to any additional distribution fee. The remaining gross receipts *395 were first to be used to pay the profit participants (Liza Minnelli and others) and then were to be retained by AIP or Oceania, depending upon whether domestic or foreign, to cover distribution costs. The balance was referred to as either "net domestic receipts" or "net foreign receipts." Until combined net domestic receipts and net foreign receipts equaled $ 6,200,000 plus interest, 100 percent of such amounts were to be paid to GIF. [5] Thereafter, any amounts paid for completion guarantees plus interest were to be recouped from 100 percent of net domestic receipts and net foreign receipts. Any receipts remaining after payment of all of the above were referred to as either "available domestic receipts" or "available foreign receipts." Available domestic receipts were to be divided: (1) 40 percent to the GIF, (2) 15 percent to Oceania, and (3) 45 percent to Productions. Available foreign receipts were to be divided: (1) 40 percent to GIF, (2) 15 percent to Productions, and (3) 45 percent to Oceania. [6]
*396 The complexity of the transaction was increased because part of the financing was to be provided by Oceania in lire. A large portion of the production was to take place in Rome under the auspices of an Italian production company, Coralta Cinematografica S.r.l. (Coralta). By agreement dated August 29, 1975, Coralta agreed to carry out the physical production of the picture in Italy. Included in the budget for the picture was a fee payable to Compagnia Di Assicurazione Di Milano in order to obtain a completion guarantee for the picture. The completion guarantee was obtained on August 28, 1975. The completion guarantor was obligated to pay to the insured, Coralta, any over-budget costs and was obligated to guarantee completion of the picture and delivery of the picture to Productions. In the alternative, the completion guarantor could take over the project or abandon the project and pay back any lender to the project. As of August 26, 1975, the estimated production budget for the project was approximately $ 6,200,000. Purchase Agreement
The Partnership entered into an agreement, dated August 29, 1975, to acquire "A Matter of Time" from Productions. The purchase agreement *397 was signed by Rosenthal on behalf of the Partnership and by Jerome Schwartz (Schwartz) as vice-president and general counsel of Productions. [7] The sale was acknowledged and affirmed by GIF, and consented to and approved by AIP and Oceania. Glass negotiated to have GIF join in the grant from Productions to the Partnership in order to insure the chain of title. The closing of the transaction was scheduled to take place on December 19, 1975, according to the terms of the agreement. Further, the agreement provided that it was to be null and void if the Partnership was not duly capitalized by the time of closing. The Partnership acquisition of the picture was subject to a production-distribution agreement, among GIF, Productions, and Oceania. Productions agreed that the copyright notice on the picture and all rights in and to the copyright of the picture throughout the world would be in the name of the Partnership or, if in the name of AIP or another, would be held as trustee for the Partnership and solely on *398 behalf of the Partnership. The copyright to "A Matter of Time" was registered to AIP by certificate filed on October 19, 1976. The purchase agreement established a price for the film of $ 7,500,000. The Partnership was to pay the purchase price to Productions with (1) $ 75,000 in cash; (2) delivery of a full-recourse promissory note in the amount of $ 675,000 with interest at 6 percent per annum, due March 15, 1976; and (3) delivery of a nonrecourse promissory note in the amount of $ 6,750,000 with interest at 6 percent per annum, due December 14, 1985. By letter dated December 30, 1975, the Partnership sent to Productions a check in the amount of $ 10,125 covering interest on the full-recourse note until maturity and a check in the amount of $ 405,000 covering interest on the nonrecourse note through December 14, 1976. [8] Also enclosed in the December 30, 1975 letter from the Partnership to Productions were executed promissory notes, one in the amount of $ 675,000 and the other in the amount of $ 6,750,000. The $ 6,750,000 nonrecourse *399 promissory note, dated December 15, 1975, provided that the note, with interest, would be paid out of 79 percent of the sums due to Productions under the production-distribution agreement dated August 27, 1975. Such amounts were to be applied first to interest accruing after April 15, 1977, and then to principal. [9] The Partnership was not obligated to pay the nonrecourse note except out of such sums. The purchase agreement further provided that the Partnership was to receive the remaining 21 percent due Productions in recoupment of the cash and full-recourse portion of the Partnership's purchase of the picture. Productions was not obligated to repay the cash or full-recourse portion of the purchase price paid by the Partnership except out of such 21 percent of the amounts due Productions under the production-distribution agreement. By a separate agreement with Productions, dated August 29, 1975, the Partnership agreed to pay any sales or similar taxes imposed by reason of the purchase agreement. *400 By letter agreement dated August 29, 1975, the Partnership notified AIP that the Partnership had purchased all of Productions' right, title, and interest in and to the picture, and that all sums payable by AIP to Productions under the production-distribution agreement were to be paid directly to the Partnership. In this agreement, Oceania also agreed to pay directly to the Partnership sums otherwise payable to Productions under the production-distribution agreement. The Partnership and AIP further agreed that after 79 percent of the amounts remitted to the Partnership aggregated $ 6,750,000 plus interest, the Partnership would be entitled to retain 10 percent of the "Available Domestic Receipts" and "Available Foreign Receipts" from the picture, as defined in the production-distribution agreement. The breakdown of all receipts for a motion picture produced in the United States is generally 60 percent receipts from United States sources and 40 percent from international sources. "A Matter of Time," however, was more likely to have a better market internationally than domestically and therefore would probably have a 40 percent to 60 percent allocation of domestic receipts to foreign *401 receipts. Purchase Date and Production
In correspondence dated November 4, 1975, Glass referred to the Partnership's agreement to purchase "A Matter of Time" as a "draft" agreement. On December 8, 1975, Glass sent to M. Morton Siegel (Siegel), counsel to AIP, a copy of a "revised" purchase agreement, requesting that they attempt to get the agreement signed promptly. On or about December 16, 1975, Siegel forwarded to Glass a copy of a "revised" purchase agreement, but the accompanying letter did not indicate whether the agreement had yet been signed. [10]
In a letter dated February 3, 1976, Siegel requested that Glass have the purchase agreement, letter agreement regarding payments and accounting, security agreement, and letter agreement regarding sales tax, which agreements were enclosed with Siegel's letter, signed on behalf of the Partnership. By letter dated February 11, 1976, Glass informed Siegel that he was returning the signed documents as requested. In a letter dated February 19, 1976, Siegel *402 forwarded to Massimo Ferrara the same documents to be signed on behalf of Oceania. Siegel described these documents as relating to "the transaction with Hampton Associates 1975, covering the second tax shelter arrangements." A telex message from David Melamed, executive vice-president in charge of finance for AIP, to Giulio Sbarigia, a principal of Oceania, dated December 2, 1975, stated in part "SECOND TAX SHELTER ARRANGEMENT IN NEGOTIATION BUT NOT YET CONCLUDED PROVIDES FOR PURCHASE AT PRICE 7,500,000 STOP WE ARE BEING PAID IN 1975 AND 1976 750,000 AGAINST THE NOTE PLUS 750,000 INTEREST STOP * * *. Another telex message from David Melamed to Giulio Sbarigia, dated January 16, 1976, in regards to "SECOND TAX SHELTER," stated in part "GLASS PREMATURE STOP CHECKS RECEIVED IN JANUARY STOP ALSO AGREEMENT NOT EFFECTIVE UNTIL REVISED AND EXECUTED BY ALL PARTIES INCLUDING YOURSELF AND GENERAL AND THIS IN PROCESS STOP WHEN CONSUMMATED WE WILL RECEIVE: GROSS AMOUNT
DOLLARS 1,300,000
LESS: COMMISSION
130,000
NET
1,170,000
* * * DECEMBER PAYMENT OF $ 415,000 RECEIVED IN JANUARY STOP PLEASE ADVISE TO WHOM AND WHERE YOUR SHARE OF PAYMENT SHOULD *403 BE MADE FOR A/C OCEANIA Principal photography on "A Matter of Time" began sometime in the middle of October of 1975. The qualified United States production costs with respect to "A Matter of Time" were $ 2,430,201. The release of the film "A Matter of Time" for theatrical distribution was on October 8, 1976. Production Service Agreements
The three pictures with respect to which the Partnership executed production service agreements were: (1) "Friday Foster," a picture starring Pam Grier and produced by Arthur Marks; (2) "Food of the Gods," based on an H. G. Wells story and produced by Bert Gordon; and (3) "Futureworld," produced by James Aubrey and Paul Lazarus as a sequel to the science fiction film "Westworld." Wetherly Productions, Inc. (Wetherly) [11] was the owner of all film rights to the three projects. In entering into the agreements, however, the Partnership was not presented with the three films as a package. *404 1. Friday Foster With respect to "Friday Foster," the Partnership entered into a production services agreement (the Friday Foster production agreement), dated August 29, 1975, with Wetherly whereby the Partnership was to provide "all functions necessary to prepare a negative of the [film] * * * [which] shall include but shall not be limited to providing the following services: all studio facilities and services, writing and directing services, production supervision services, services of actors and actresses, photography, sound, mixing, editing and music." The total contract price pursuant to the agreement, as amended, was $ 1,710,000. The budget for the film was $ 960,000. Productions executed a completion guarantee in favor of the Partnership wherein Productions unconditionally guaranteed the completion of the picture. Wetherly entered into a distribution agreement for "Friday Foster" (the Friday Foster distribution agreement) with AIP wherein AIP guaranteed payment of net producer's share of gross receipts to Wetherly in the amount of $ 749,750 plus interest, [12] as set out in an amendment thereto, on or before September 1977. Pursuant to the Friday Foster distribution *405 agreement, AIP was entitled to first reimburse itself for all distribution fees and costs incurred in distribution of "Friday Foster." The amount of gross receipts remaining after AIP deducted distribution fees and costs was called "net producer's share of gross receipts" and was payable as follows: (1) 21.9 percent payable to Wetherly until Wetherly received $ 210,250, and 78.1 percent to be retained by AIP to the extent AIP had made guaranteed payments of net producer's share of gross receipts and any amount in excess of such guaranteed payments to be paid to Wetherly; (2) thereafter 100 percent to Wetherly until Wetherly had recouped any completion monies advanced with interest; and (3) thereafter all remaining amounts to Wetherly. [13]
*406 Pursuant to the Friday Foster production agreement, as amended, the Partnership was to receive total fixed payments from Wetherly in the amount of $ 749,750 plus interest. [14] The total fixed payments were to be paid to the Partnership in monthly installments commencing January 2, 1977, each installment to be equal to 78.1 percent of the amount paid to Wetherly by AIP in the preceding month pursuant to the Friday Foster distribution agreement, [15] but in all cases such amount plus interest was to be paid in full no later than September 1, 1977. In addition to the fixed payments, Wetherly was to pay the balance of the contract price as follows: (1) $ 210,250 with interest in monthly installments commencing January 2, 1977, payable out of all monies received by Wetherly from AIP pursuant to the Friday Foster distribution agreement in excess of the sum payable monthly as fixed payments; and (2) $ 750,000 payable in quarterly installments commencing on October 15, 1977, out of 10.95 percent of the net profits of the picture. For this purpose net profits were defined as the gross receipts remitted to Wetherly by AIP (gross receipts less distribution fees and distribution expenses) in *407 excess of the sum of the amounts specified above ($ 749,750 and $ 210,250) and amounts advanced by AIP pursuant to its completion guarantee. The Partnership entered into an agreement to borrow from Bank of America National Trust and Savings Association (Bank of America) the sum of $ 780,322. Interest on such amoung was to accrue at a rate of 1 percent over the prime rate charged by Bank of America. Pursuant to the loan agreement between the Partnership and Bank of America, there was no guarantee or personal liability assumed by any partner or the Partnership itself. To secure the loan from Bank of America, the Partnership gave Bank of America a security interest in the proceeds from the Friday Foster production agreement with Wetherly. Further, AIP unconditionally guaranteed to Bank of America that they would complete the picture *408 or pay to the bank the entire sum of the outstanding loan. Wetherly assigned to Bank of America the guaranteed net producer's share of gross receipts payable by AIP under the Friday Foster distribution agreement. The loan agreement with Bank of America was subsequently reduced to $ 749,750. There was a letter agreement between Productions and Arthur Marks, dated August 7, 1975, hiring Arthur Marks as director and producer of "Friday Foster," but the agreement was not signed by Productions. The principal photography of "Friday Foster" was completed prior to December 1975, and the film was generally released on December 25, 1975. Production of "Friday Foster" took place in Los Angeles, California and Washington, D.C. The Partnership assigned to Wetherly all contract rights in connection with "Friday Foster," and Wetherly assigned to Productions all coyprights and rights in negatives with respect to the film.
2. Food of the Gods With respect to "Food of the Gods," the Partnership entered into a production services agreement (the Food of the Gods production agreement), dated August 29, 1975, with Wetherly whereby the Partnership was to provide "all functions necessary to prepare *409 a negative of the [film] * * * [which] shall include but shall not be limited to providing the following services: all studio facilities and services, writing and directing services, production supervision services, services of actors and actresses, photography, sound, mixing, editing and music." The total contract price pursuant to the agreement, as amended, was $ 2,450,000. The budget for the film was $ 1,483,250. AIP executed a completion guarantee in favor of the Partnership wherein AIP unconditionally guaranteed the completion of the picture. Wetherly entered into a distribution agreement for "Food of the Gods" (the Food of the Gods distribution agreement) with AIP wherein AIP guaranteed payment of net producer's share of gross receipts to Wetherly in the amount of $ 1,151,250 plus interest, [16] on or before October 2, 1977. Pursuant to the Food of the Gods distribution agreement, AIP was entitled to first reimburse itself for all distribution fees and costs incurred in distribution of "Food of the Gods." The amount of gross receipts remaining after AIP deducted distribution fees and costs was called "net producer's share of gross receipts" and was payable as follows: *410 (1) 22.38 percent payable to Wetherly until Wetherly received $ 332,000, and 77.62 percent to be retained by AIP to the extent AIP had made guaranteed payments of net producer's share of gross receipts and any amount in excess of such guaranteed payments to be paid to Wetherly; (2) thereafter 100 percent to Wetherly until Wetherly had recouped any completion monies advanced with interest; and 3) thereafter all remaining amounts to Wetherly. [17]
Pursuant to the Food of the Gods production agreement, as amended, the Partnership was to receive total fixed payments from Wetherly in the amount of $ 1,203,788 plus interest. [18] The total fixed payments were to be paid to the Partnrship in monthly installments commencing January 15, 1977, each installment to be equal to 81.175 percent of the amount paid to Wetherly *411 by AIP in the preceding month pursuant to the Food of the Gods distribution agreement, [19] but in all cases such amount plus interest was to be paid in full no later than September 1, 1977. In addition to the fixed payments, Wetherly was to pay the balance of the contract price as follows: (1) $ 279,212 with interest in monthly installments commencing January 15, 1978, payable out of all monies received by Wetherly from AIP pursuant to the Food of the Gods distribution agreement in excess of the sum payable monthly as fixed payments; and (2) $ 967,000 payable in quarterly installments commencing on October 15, 1977, out of 9.412 percent of the net profits of the picture. For this purpose net profits were defined as the gross receipts remitted to Wetherly by AIP (gross receipts less distribution fees and distribution expenses) in excess of the sum of the amounts specified above ($ 1,203,788 and $ 279,212) and amounts advanced by AIP pursuant to its completion guarantee. *412 The Partnership entered into an agreement to borrow from Bank of America the sum of $ 1,151,000. Interest on such amount was to accrue at a rate of 1 percent over the prime rate charged by Bank of America. Pursuant to the loan agreement between the Partnership and Bank of America, there was no guarantee or personal liability assumed by any partner or the Partnership itself. To secure the loan from Bank of America, the Partnership gave Bank of America a security interest in the proceeds from the Food of the Gods production agreement with Wetherly. Further, AIP unconditionally guaranteed to Bank of America that they would complete the picture or pay to the bank the entire sum of the outstanding loan. Wetherly assigned to Bank of America the guaranteed net producer's share of gross receipts payable by AIP under the Food of the Gods distribution agreement. The Partnership entered into a loan agreement with Harlene Music Publications (Harlene) to borrow $ 52,788. Interest on such amount was to accrue at a rate of 1 percent over the prime rate charged by Bank of America. Schwartz signed the loan agreement as vice president of Harlene. Pursuant to this loan agreement, no personal *413 guarantee or liability was assumed by the Partnership or any partner. The Partnership secured its loan with Harlene by assigning to Harlene a security interest in the guaranteed payments under the Food of the Gods production agreement. The principal photography of "Food of the Gods" was commenced on November 10, 1975, and the film was generally released on June 25, 176. The Partnership assigned to Wetherly all contract rights in connection with "Food of the Gods."
3. Futureworld With respect to "Futureworld," the Partnership entered into a production services agreement (the Futureworld production agreement), dated August 29, 1975, with Wetherly whereby the Partnership was to provide "all functions necessary to prepare a negative of the [film] * * * [which] shall include but shall not be limited to providing the following services: all studio facilities and services, writing and directing services, production supervision services, services of actors and actresses, photography, sound, mixing, editing and music." The total contract price pursuant to the agreement, as amended, was $ 5,001,000. The budget for the film was $ 2,001,000. Wetherly entered into a distribution agreement *414 for "Futureworld' (the Futureworld distribution agreement) with AIP wherein AIP guaranteed payment of net producer's share of gross receipts to Wetherly in the amount of $ 2,301,000 plus interest [20] on or before January 2, 1978. Pursuant to the Futureworld distribution agreement, AIP was entitled to first reimburse itself for all distribution fees and cost incurred in distribution of "Futureworld." The amount of gross receipts remaining after AIP deducted distribution fees and costs was called "net producer's share of gross receipts" and was payable as follows: (1) 23.33 percent payable to Wetherly until Wetherly received $ 700,000, and 76.67 percent to be retained by AIP to the extent AIP had made guaranteed payments of net producer's share of gross receipts and any amount in excess of such guaranteed payments to be paid to Wetherly; (2) thereafter 100 percent to Wetherly until Wetherly had recouped any completion monies advanced with interest; and (3) thereafter all remaining amounts to Wetherly. [21]
*415 Pursuant to the Futureworld production agreement, as amended, the Partnership was to receive total fixed payments from Wetherly in the amount of $ 2,412,300 plus interest. [22] The total fixed payments were to be paid to the Partnership in monthly installments commencing January 2, 1977, each installment to be equal to 80.4 percent of the amount paid to Wetherly by AIP in the preceding month pursuant to the Futureworld distribution agreement, [23] but in all cases such amount plus interest was to be paid in full no later than September 1, 1977. In addition to the fixed payments, Wetherly was to pay the balance of the contract price as follows: (1) $ 588,700 with interest in monthly installments commencing January 2, 1977, payable out of all monies received by Wetherly from AIP pursuant to the Futureworld distribution agreement in excess of the sum payable monthly as fixed payments; and (2) $ 2,000,000 payable in quarterly installments commencing on October 15, 1977, out of 9.8 percent of the net profits of the picture. For this purpose net profits were defined as the gross receipts remitted to Wetherly by AIP (gross receipts less distribution fees and distribution expenses) in excess *416 of the sum of the amounts specified above ($ 2,412,300 and $ 588,700) and amounts advanced by AIP pursuant to its completion guarantee. The Partnership entered into an agreement to borrow from Bank of America the sum of $ 2,301,000. Interest on such amount was to accrue at a rate of 1 percent over the prime rate charged by Bank of America. Pursuant to the loan agreement between the Partnership and Bank of America, there was no guarantee or personal liability assumed by any partner or the Partnership itself. To secure the loan from Bank of America, the Partnership gave Bank of America a security interest in the proceeds from the Futureworld production agreement with Wetherly. Further, AIP unconditionally guaranteed to Bank of America that they would complete the picture or pay to the bank the entire sum of the outstanding loan. Wetherly *417 assigned to Bank of America the guaranteed net producer's share of gross receipts payable by AIP under the Futureworld distribution agreement. The Partnership entered into a loan agreement with Harlene to borrow $ 111,300. Interest on such amount was to accrue at a rate of 1 percent over the prime rate charged by Bank of America. Schwartz signed the loan agreement as vice president of Harlene. Pursuant to this loan agreement, no personal guarantee or liability was assumed by the Partnership or any partner. The Partnership secured the loan from Harlene by assigning to Harlene a security interest in the guaranteed payments under the Futureworld production agreement. Paul N. Lazarus, III, the producer of "Futureworld," entered into an agreement with MGM whereby he was permitted to make a sequel to the film "Westworld," to be called "Futureworld," if AIP agreed to produce, finance, and distribute the movie and AIP agreed to the terms and conditions of the agreement with MGM. AIP subsequently received an assignment of Lazarus' rights under the agreement and assumed the obligations under the agreement. The principal photography of "Futureworld" was commenced on February 9, 1976, and *418 the film was generally released on July 14, 1976. Production of "Futureworld" took place in Los Angeles, California and Houston, Texas. The Partnership assigned to Wetherly all contract rights in connection with "Futureworld." Production Services
Bank of America had no credit relationship with the Partnership and looked to AIP's line of credit when making the loans to the Partnership in connection with the production of the three production service films. Bank of America looked to AIP for repayment of the loans as a result of the completion guarantees and the assignment of rights under the distribution and production services agreements. AIP delivered the checks of the Partnership in payment of the loans. Bank of America had no relationship with the Partnership prior to or after the three loans relating to the production service films. AIP was in the business of producing and distributing motion pictures to theatre and television sources. David Melamed (Melamed) was executive vice-president in charge of finance for AIP during the years in issue and Dennis Brown (Brown) was the production controller. As production controller, Brown was responsible for controlling the *419 financial aspects of the productions by AIP, specifically the accounting, payrolling for productions, budgeting and cost projections. Paul Picard was head of production for AIP during the years in issue and was responsible for creative decisions. Elliott Schick (Schick) was an executive production manager for AIP and a staff employee during the years in issue. As an executive production manager for AIP, Schick was in charge of the physical production of the below-the-line (technical) areas and would supervise the independent production manager on each film. Sal Billiteri was head of post-production for AIP and a staff employee during the years in issue. Lucille Keister worked for Melamed in the corporate, financial, accounting, and payroll areas during the years in issue. A production service company is a company that supplies the necessary personnel, equipment, and expertise to a production unit to effectuate the filming of a movie. The services commonly rendered by such companies include: (1) making arrangements to acquire permits to allow filming on location; (2) providing staging facilities; (3) making arrangements with labs where film is to be developed; (4) making arrangements *420 with prop and costume companies; (5) examining the script, budget, and shooting schedule to determine whether the film has been properly budgeted; (6) providing payroll services for the producer; and (7) arranging insurance for the producer. The production unit consists of the producer, director, cast, and all the below-the-line (technical) personnel that are on location during the production of a film. The production manager is responsible for negotiating with the crew, making arrangements for crew and equipment, and supervising the production accountant. A production accountant is responsible for keeping the books, closing the payroll, developing accounting cost projections, and budgeting, and works on a daily basis with the production unit. Brown, the production controller for AIP, dealt with the production accountants during the production of each of the three production service films to insure that the proper information and reports were being sent to AIP. Marty Hornstein was the production manager of "Futureworld" and an independent contractor. Paul Roedle was a previous employee of AIP who was hired to be production accountant for "Futureworld" after meeting with the *421 production manager, producer, and production people at AIP. Chuck Stroud functioned as associate producer of "Friday Foster" and was brought into the project by Arthur Marks, the producer. Duncan Denault acted as the production accountant for may of AIP's films and was the production accountant for "Friday Foster" and "Food of the Gods." Bert Gordon was the producer and director of "Food of the Gods" and his wife, Flora Gordon, was the production manager. The Partnership was the production company of record for the three production service films. The Partnership was signatory to the guild and union agreements and employer of record for purposes of payroll taxes, worker's compensation, and disability insurance. Brown, the production controller for AIP, dealt with the guild and unions to obtain the necessary papers in order to make the Partnership a signatory on such agreements. Brown forwarded the papers to Rosenthal for his execution on behalf of the Partnership. Rosenthal did not negotiate any of the contracts involved in the production of the films. The Partnership was not involved in any of the arrangements for the filming of the movies on location and neither Rosenthal nor *422 any other representative of the Partnership ever visited any of the films on location. In certain situations, AIP personnel would sign agreements on behalf of the Partnership and then advise the Partnership of such action. With respect to the film "Food of the Gods," Brown arranged for a bank account at the Canadian Imperial Bank of Commerce in Vancouver. The Canadian Bank account required two signatures for withdrawals: one signature was to be either Duncan Daneault or Brown and the other signature was to be Bert Gordon, Flora Gordon, or Rosenthal. In fact, all checks written for production services connected to the movie "Food of the Gods" were signed by two of the following: Duncan Daneault or Brown and Flora Gordon or Bert Gordon. All production service expenses connected to the production of the film "Futureworld" were paid by checks from a checking account at the Bank of America and signed by two of the following: Brown, Marty Hornstein, or Lucille Keister. Rosenthal was never listed as a signatory with respect to this account. The production service expenses connected to the production of the film "Friday Foster" were paid by checks from a checking account at the Bank *423 of America and signed by two of the following: Duncan Daneault or Brown and Chuck Stroud or Arthur Marks. Brown had arranged for the bank accounts at Bank of America which were used for "Futureworld" and "Friday Foster." AIP made all the arrangements with the National Aeronautics and Space Administration (NASA) for the filming of "Futureworld' on location at NASA facilities. Marty Hornstein, the independent production manager of "Futureworld," signed the cooperative agreement with NASA on behalf of the Partnership. AIP was required to guarantee the Partnership's performance on the cooperative agreement. AIP also negotiated, and signed on behalf of the Partnership, an agreement relating to the filming of "Futureworld" at MGM studio facilities. Flora Gordon and Bert Gordon made all the arrangements for the filming of "Food of the Gods" on location on Bowen Island, Canada. Bert Gordon also signed, on behalf of the Partnership, a contract for post-production services with respect to "Food of the Gods." AIP negotiated and arranged for agreements securing the music for the movie "Futureworld." AIP negotiated and arranged for an agreement with Elliot Kaplan, composer of the music *424 for the film "Food of the Gods," which was signed by Rosenthal on AIP stationery. Arthur Marks, producer of "Friday Foster," signed on behalf of the Partnership the agreements regarding the music for use in that movie. AIP negotiated and obtained the services of Gene Polito as director of photography for "Futureworld." AIP arranged with various actors to obtain releases in order to be permitted to use footage from the film "Westworld" in the film "Futureworld." Marty Hornstein negotiated a promotional deal with an advertising agency to promote various companies in the film "Futureworld." AIP negotiated and arranged for all insurance coverage and claims for the three production service movies. AIP was responsible for making all disbursements for production services relating to the movies and controlling the budgets. AIP negotiated for the contracts with actors which were entered into by the Partnership. Either Arthur Marks, producer of "Friday Foster," or Charles Stroud, associate producer of "Friday Foster," signed the employment agreements with actors for "Friday Foster" on behalf of the Partnership. Contracts with employees for "Futureworld" were signed by Elliot Schick and *425 Jerome Schwartz, both employees of AIP, on behalf of the Partnership. AIP was required to guarantee the Partnership's performance in order to induce Yul Brynner, Peter Fonda, and Blythe Danner to agree to provide services for "Futureworld." Returns and Results
The Partnership reported its income and deductions using the cash receipts and disbursements method of accounting. On its 1975 U.S. partnership return of income, the Partnership claimed the following deductions: (1) $ 26,000 as payment to the partners; (2) $ 421,879.79 as interest, consisting of $ 6,754.79 paid to the Bank of America and $ 415,125 paid to Productions; and (3) $ 3,836,519.07 as other deductions characterized as $ 3,835,880.25 for production services and $ 638.82 for stationery and printing. The Partnership reported $ 14,128.50 in income consisting of $ 10,830.82 of interest income and $ 3,289.68 as gain on an exchange. On its 1976 U.S. partnership return of income, the Partnership claimed deductions totalling $ 6,784,684.49, consisting of: (1) $ 444,434,34 of interest expense consisting of $ 12,993.15 to the Bank of Raleigh, $ 274,429.12 to the Bank of America, $ 22,012.07 to Citibank, and $ 135,000 *426 to Productions; (2) amortization of "A Matter of Time" in the amount of $ 2,760,000; and (3) other deductions of $ 3,573,870.92 for production services, $ 1,802.60 for administrative expenses, and $ 4,576.63 for service fees. The Partnership also claimed, on its 1976 return, a basis in qualified property for investment tax credit of $ 3,000,000. The Partnership reported $ 442,545.76 of income consisting of $ 172,200.67 in gross receipts, the source of which is not identified on the return, and $ 270,345.09 of interest income. The Partnership had paid Citibank interest on a loan during 1976 in the amount of $ 22,012.07. The Partnership received a letter of credit from Robert Kosnoski in the amount of $ 200,000 which was discounted by the Bank of Raleigh by the amount of $ 12,993.15. The Bank of Raleigh issued a check to the Partnership, dated April 13, 1976, in the amount of $ 187,006.85. The amount of the discount represented interest calculated at 8 3/4 percent for the period from April 13, 1976 to January 9, 1977, the due date on the letter of credit. The amortization deduction claimed with respect to "A Matter of Time" was based on an amortization table supplied by AIP *427 depreciating the film over two and one-half years and showing a cumulative percentage of 46 percent after 12 weeks release. The Partnership used $ 6,000,000 as the basis for computing this amortization, which represented 80 percent of its cost with a reserve of 20 percent for television. The reserve of 20 percent for television was based on an industry expectation that 20 percent of the revenue produced by a film would normally be produced from television. On June 27, 1980, the available domestic receipts allocable to Productions pursuant to the production-distribution agreement totalled $ 199,341.02, of which the Partnership's 21 percent was $ 41,861.61. The balance of $ 157,479.41 was to go to AIP towards payment of interest first, then principal on the nonrecourse note. As of December 30, 1983, exploitation of "A Matter of Time" had generated $ 1,300,000 in domestic distributor's gross receipts. As of that time, however, no principal on the nonrecourse note had been paid and accrued interest totalled $ 2,733,750, of which $ 304,520.36 had been paid from 79 percent of the available domestic receipts allocable to Productions pursuant to the production-distribution agreement, leaving *428 a balance of $ 2,429,229.64. The $ 6,750,000 nonrecourse note, which was originally due on December 14, 1985, was extended by AIP on March 17, 1982 to January 15, 1980. [24]
OPINION As a result of the above-described transactions, petitioners claimed an investment tax credit, deductions for amortization of the film "A Matter of Time," various interest deductions, deductions resulting from the production service agreements, and other miscellaneous deductions. Respondent has put forth a variety of grounds for disallowing the claimed investment tax credit and deductions. A Matter of Time
Our initial inquiry is to determine what, if any, interest the Partnership acquired by entering into the purchase agreement with respect to "A Matter of Time." A review of the record leads us to the conclusion that the Partnership did not acquire an ownership interest in *429 the film "A Matter of Time." Rather, we believe that the Partnership acquired a speculative future profits interest in the exploitation of the film by AIP and Oceania. For Federal tax purposes, the sale of a motion picture occurs when all substantial rights of value in the motion picture copyright are transferred. Such a sale has not occurred if the transferor retains proprietary rights in the motion picture. Durkin v. Commissioner,87 T.C. 1329 (1986); Tolwinsky v. Commissioner,86 T.C. 1009, 1042-1043 (1986). A motion picture copyright includes the exclusive rights to produce copies of the motion picture, prepare derivative works based upon the motion picture, distribute copies of the motion picture to the public by sale or rental, exhibit the motion picture to the public, and display to the public still photographs taken from the motion picture. 17 U.S.C. sec. 1 (1976); 17 U.S.C. sec. 106 (1982) (effective Jan. 1, 1978). For Federal tax purposes, whether the benefits and burdens of ownership have been transferred is a factual determination. Leahy v. Commissioner,87 T.C. 56, 66 (1986). *430 Factors which are relevant to this determination include: (1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property. See Grodt & McKay Realty, Inc. v. Commissioner, [77 T.C. 1221, 1237-1238]. * * * [Houchins v. Commissioner,79 T.C. 570, 591 (1982); Fn. ref. omitted.] A thorough review of the record convinces us that AIP and Oceania received complete and exclusive control of the economic interests in "A Matter of Time." Productions purportedly received ownership of the film and copyright from GIF and then conveyed such rights to the Partnership. The conveyance of rights to the Partnership, however, was subject to the distribution agreement entered into by Productions, GIF, and Oceania. Pursuant to the distribution agreement, AIP and Oceania were to possess The sole, *431 exclusive and irrevocable right, license and privilege under copyright to rent, lease, license, exhibit, distribute, reissue, deal in and with respect to the Picture and prints or any part thereof, and trailers thereof, and to license others to do so, in standard gauges, theatrically and non-theatrically, and by means of television in all forms, whether now known or hereafter to be known, and by means of wire, cartridges, cassettes and any and all other means of projection, transmission, broadcasting and exhibition, as hereafter more fully set forth, throughout the entire world * * * in perpetuity.[Emphasis added.]
Such a combination of rights constitutes virtually the entire bundle of rights that is a copyright. Durkin v. Commissioner, supra;Tolwinsky v. Commissioner, supra.This distribution agreement in fact transferred all of the basic rights associated with the copyright to AIP and Oceania, leaving the Partnership with a mere "bare" copyright. The production-distribution agreement and purchase agreement provided for the allocation of the gross receipts earned from the exploitation of the film. Based upon the production-distribution *432 agreement, the gross receipts were to be allocated first to AIP and Oceania as distribution fees, in amounts ranging from 15 percent to 40 percent of gross receipts (or 15 percent off net receipts in the case of Oceania) depending upon the type of receipt. Second, remaining gross receipts were to used to pay profit participants and, depending upon whether foreign or domestic, were to be used by AIP or Oceania to cover distribution costs. Any remaining gross receipts were referred to as either "net domestic receipts" or "net foreign receipts," and until such combined amounts totalled $ 6,200,000 plus interest, GIF or its assign (i.e., the production service company) was to receive 100 percent of such amounts. Thereafter, any amounts paid for completion guarantees plus interest were to be recouped from 100 percent of combined net receipts. Following payment of all of the above, any remaining receipts were referred to as either "available domestic receipts" or "available foreign receipts." Available domestic receipts were to be divided: (1) 40 percent to the GIF, (2) 15 percent to Oceania, and (3) 45 percent to Productions. Available foreign receipts were to be divided: (1) 40 percent *433 to GIF, (2) 15 percent to Productions, and (3) 45 percent to Oceania. The Partnership effectively stepped into Production's position with respect to the production-distribution agreement except to the extent allocations were retained by Productions. The allocations provided by the production-distribution agreement were controlling with respect to the Partnership's interest in the gross receipts earned from the exploitation of "A Matter of Time." The purchase agreement provided, however, that of the amounts that had been allocated to Productions by the production-distribution agreement, Productions was to continue to receive 79 percent in payment of the $ 6,750,000 nonrecourse note plus interest. After the nonrecourse note had been paid in full with interest, the Partnership's share of available domestic and foreign receipts was to be 10 percent. The allocation of receipts from the exploitation of the film in excess of breakeven is indicative of the parties' ownership interests in the film. The production-distribution agreement did not have a limited term and, as a result, the amount of profit which AIP and Oceania could receive from their distribution efforts and the term of their *434 control over the film were not limited. Based upon the complete control over the exploitation of the film given AIP and Oceania in perpetuity and the fact AIP and Oceania would receive the major portion of any profits generated by the film, while the Partnership would not receive in excess of 10 percent of the profits, we conclude that the Partnership purchased a 10-percent interest in the net receipts in excess of breakeven from the exploitation of "A Matter of Time." Our conclusion that the Partnership was not the true owner of "A Matter of Time" does not require us to view the transaction as one which is wholly lacking in economic substance and which must therefore be disregarded for Federal tax purposes. See Falsetti v. Commissioner,85 T.C. 332 (1985). A review of the facts and circumstances of this case convinces us that the transactions here at issue were not devoid of economic substance so as to be properly disregarded for Federal tax purposes. The dealings between AIP and Rosenthal, Glass, and Sharmat appear to have some indicia of arm's-length dealings and the contractual terms of the production-distribution and purchase agreements bear economic significance *435 indicative of a financial interest in the exploitation of the film. Compare Helba v. Commissioner,87 T.C. 983 (1986); Falsetti v. Commissioner, supra.We view this transaction as one in which the Partnership acquired an intangible contractual right which is to be recognized for Federal tax purposes. [25]
Our conclusion that the Partnership is not the true owner of "A Matter of Time" does require a finding that the Partnership did not possess a depreciable interest in the film. The Partnership's intangible contractual right to net receipts from exploitation of the film, however, is a depreciable interest. Durkin v. Commissioner, supra;Tolwinsky v. Commissioner, supra at 1052, 1053. The parties, however, have disagreed as to the method of depreciation which should properly be applied to the interest the Partnership acquired with respect to the exploitation of "A Matter of Time." Petitioners contend that the method which the Partnership used in preparing its returns was an *436 appropriate method which properly reflected the decline in value of the film and that such method reflects "industry standards." This method consisted of using a "sliding scale" method of depreciating the film over a period of two and one-half years and resulted in a cumulative depreciation of 46 percent of the claimed depreciable cost of the film during the 12 weeks of release in 1976. Respondent contends that the income-forecast method of depreciation must be used by the Partnership and, because the Partnership reported no income from the film in 1976, that the Partnership is not entitled to claim any depreciation with respect to the film in 1976. In Massey Motors, Inc. v. United States,364 U.S. 92, 104, (1960), the Supreme Court stated that It is the primary purpose of depreciation accounting to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the periods to which it contributes. * * * In Rev. Rul. 60-358, 1960-2 C.B. 68, respondent states his position that the general methods of depreciation prescribed by section 167(b) are *437 inappropriate with respect to films because films typically produce an uneven flow of income, and that the usefulness of a film is more realistically measured by the flow of income it produces than by the mere passage of time. Respondent therefore authorized the use of the income-forecast method of depreciation with respect to films, which method allows depreciation deductions in each year geared to the amount of income produced during that year. Schneider v. Commissioner,65 T.C. 18, 32-33 (1975). The relevant income in applying this method of depreciation is that earned and reported, under its method of accounting, by the entity claiming the depreciation deduction. Siegel v. Commissioner, supra at 693. Both of the parties herein make reference to our decision in KIRO, Inc. v. Commissioner,51 T.C. 155 (1968), as supporting their positions with respect to the proper depreciation method to be used by the Partnership. In KIRO,Inc., a local network affiliate television station entered into 41 contracts with licensors of films at a total cost of slightly more than $ 1,000,000. The contracts entered into allowed a set number *438 of telecasts of each film but also provided that the licensor could withdraw any licensed film by paying a certain credit or refund. The amount of the credit or refund which the licensor was required to pay depended upon the number of telecasts which had occurred prior to the withdrawal and was based upon a sliding scale. This sliding scale was also the basis upon which the taxpayer therein claimed amortization of the cost of the contracts. We held that based upon the terms of the licensing contracts and the "facts of life" of the television industry, the taxpayer's method of depreciating the cost of the contracts was proper. 51 T.C. at 170. The contract rights acquired by the Partnership herein are clearly different from those acquired by the taxpayer in KIRO, Inc. The terms of the purchase agreement entered into by the Partnership established a payment scheme by which the amounts received by the Partnership did not bear a constant relationship to the gross receipts earned from the exploitation of the film. The Partnership's interest in the film was initially to be based on 21 percent of available domestic and foreign receipts until such time as the nonrecourse *439 note was paid, and then shifted to 10 percent of such receipts. Available domestic and foreign receipts would not be earned until the film's production costs had been recouped. As a result, a standard method used in the industry for calculating depreciation on the underlying film would not be a proper method for depreciating the intangible contractual rights received by the Partnership. Further, the contractual terms of the purchase agreement herein do not create a reasonable matching relationship between the loss in value of the Partnership's contractual rights and a time based "sliding scale." Petitioners have failed to demonstrate error in respondent's determination that the proper method for depreciating the Partnership's intangible contractual right was the income-forecast method. Rule 142(a). [26] Accordingly, we find that petitioner's may not take depreciation deductions based upon the use of the "sliding scale" method utilized by the Partnership in preparing its returns, but rather, since petitioners have not claimed any other allowable method of depreciation, they must use the income-forecast method of depreciation. [27]
*440 We must next determine whether the partnership may include the nonrecourse purchase debt within the amount of its depreciable basis in the intangible contractual right. Unless a debt is bona fide it does not reflect an investment in the property acquired and cannot be included in a taxpayer's depreciable basis. Tolwinsky v. Commissioner, supra at 1056; Estate of Franklin v. Commissioner,544 F.2d 1045, 1047 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The presence of a nonrecourse note in a sale leaseback context does not necessarily deprive the debt of its character as genuine indebtedness even if payments on the note are geared to interest and amortization. See Estate of Franklin v. Commissioner, supra at 1047; Hilton v. Commissioner,74 T.C. 305, 348 (1980), afd. 671 F.2d 316 (1982). Due to the obvious opportunities for "trifling with reality," however, such transactions are subject to special scrutiny. Elliott v. Commissioner,84 T.C. 227, 244 (1985), *441 aff. without published opinion 782 F.2d 1027 (3d Cir. 1986). Because the Partnership purchased only an interest in the net profits from the exploitation of the film, the only benefit which the retirement of the nonrecourse debt would produce, other than tax benefits, was a 10-percent participation in the net receipts from the exploitation of the film. The nonrecourse debt in this context was simply a mechanism for allocating receipts from the film to Productions while attempting to give the Partnership a greater depreciable basis. Accordingly, we find that the nonrecourse debt used by the Partnership to acquire its rights in the exploitation of "A Matter of Time" lacked "purpose, substance, or utility apart from the anticipated tax consequences." Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). Petitioners nonetheless argue that the price set in the purchase agreement was not less than the fair market value of the film and that therefore the Partnership was entitled to include the debt in its depreciable basis. We note that the estimated cost of production of the film in 1975 was approximately $ *442 6,200,000 and that this may indicate that the price set in the purchase agreement was not unreasonable. See Siegel v. Commissioner,78 T.C. 659 (1982). The fact that the fair market value of the film may have approximated the purchase price set in the purchase agreement, however, is not determinative as to whether the Partnership's nonrecourse debt was bona fide because for Federal tax purposes the Partnership did not purchase the film. Law v. Commissioner,86 T.C. 1065, 1100 (1986). Further, it could not be reasonably argued on the facts here presented that the 10-percent interest in net receipts in excess of breakeven acquired by the Partnership had a fair market value of $ 7,500,000. Based on the foregoing, the Partnership is not entitled to include the amount of the nonrecourse debt in its depreciable basis. The Partnership purchased its interest in the exploitation of the film by payment of $ 75,000 in cash and execution of a recourse promissory note in the amount of $ 675,000 and a nonrecourse note in the amount of $ 6,750,000. The Partnership also paid amounts designated as interest of $ 10,125 with respect to the recourse note and $ 405,000 *443 with respect to the nonrecourse note. In July of 1976, the Partnership also paid $ 135,000 as interest on the nonrecourse note for the period from December 15, 1976 to April 14, 1977. We have held that the nonrecourse note did not represent a bona fide indebtedness and it cannot be included in petitioner's depreciable basis. Such a debt is also not capable of supporting a deductible interest payment. As such, the payments of $ 405,000 and $ 135,000 made by the Partnership and designated as interest on the nonrecourse debt are not deductible payments of interest. However, such payments are properly considered an investment by the Partnership in the intangible interest it acquired and should be included in its depreciable basis. See Tolwinsky v. Commissioner, supra at 1057; Siegel v. Commissioner, supra at 686-687 & n. 5. Accordingly, we find the Partnership's basis in its intangible contractual right was $ 1,290,000. The recourse debt of the Partnership was a bona fide obligation and was therefore capable of supporting an interest deduction. A check for interest in the amount of $ 10,125, which covered all of the interest accruing on the note *444 from the time of its execution until the time of its maturity on March 15, 1976, was enclosed in a letter dated December 30, 1975, from the Partnership to Productions. Such payment, however, clearly cannot be deducted in 1975 unless the purchase agreement and the recourse note executed pursuant thereto became binding obligations conferring rights and duties upon the Partnership in 1975. [28] Petitioners argue that they entered into the purchase agreement as a binding obligation on August 29, 1975, the date shown on the written agreement. Respondent argues that such agreement was not entered into until sometime in 1976. In a letter dated November 4, 1975, Glass referred to the purchase agreement as a "draft agreement," and on December 8, 1975, Glass *445 forwarded a copy of a "revised" purchase agreement to Siegel and requested that they attempt to have it signed promptly. In a letter dated February 3, 1976, Siegel requested that Glass have the purchase agreement signed on behalf of the Partnership. In a letter dated February 11, 1976, Glass informed Siegel that he was returning the signed purchase agreement as requested. Clearly the written purchase agreement was not executed by the parties until sometime in February of 1976. Nonetheless, petitioners argue that there had been a "meeting of the minds" with respect to the terms of the purchase agreement and that all of the parties thereto considered themselves to be bound to the terms of the purchase agreement as of August 29, 1975. A telex message sent by David Melamed, executive vice-president in charge of finance for AIP, dated December 2, 1975, stated in part "SECOND TAX SHELTER ARRANGEMENT IN NEGOTIATION BUT NOT YET CONCLUDED PROVIDES FOR PURCHASE AT PRICE 7,500,000 STOP WE ARE BEING PAID IN 1975 AND 1976 750,000 AGAINST THE NOTE PLUS 750,000 INTEREST STOP * * *. Another telex message sent by David Melamed to Giulio Sbarigia, a principal of Oceania, dated January 16, 1976, stated *446 in part "GLASS PREMATURE STOP CHECKS RECEIVED IN JANUARY STOP ALSO AGREEMENT NOT EFFECTIVE UNTIL REVISED AND EXECUTED BY ALL PARTIES INCLUDING YOURSELF AND GENERAL AND THIS IN PROCESS STOP * * *. Both of these telex messages indicated that they were in reference to the "SECOND TAX SHELTER ARRANGEMENT." In a letter dated February 19, 1976, Siegel had described the purchase agreement and other documents as relating to "the transaction with Hampton Associates 1975, covering the second tax shelter arrangements." (Emphasis added.) Finally, we note that some of the correspondence from AIP to the Partnership was printed on AIP letterhead which included a preprinted statement that "No agreement will be binding on this corporation unless in writing and signed by a corporate officer." We find that the Partnership did not enter into the purchase agreement until sometime in February of 1976. The recourse debt was, therefore, not a present obligation of the Partnership at the end of 1975 and could not support an interest deduction at that time. Accordingly, the Partnership was not entitled to claim the $ 10,125 interest deduction with respect to the recourse note until 1976. We next *447 consider respondent's contention that the Partnership's investment in the exploitation of "A Matter of Time" was an activity not engaged in for profit. Whether an activity is one engaged in for profit depends upon whether the taxpayer has a bona fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Jasionowski v. Commissioner,66 T.C. 312, 321 (1976). The determination is to be made based upon a consideration of all facts and circumstances. Sec. 1.183-2(b), Income Tax Regs.; Jasionowski v. Commissioner, supra.After a thorough review of the record, we believe that the Partnership's participation in the exploitation of "A Matter of Time" was an activity engaged in for profit. Rosenthal, Glass, and Sharmat were all experienced in the motion picture industry. Rosenthal had 35 years of experience in the entertainment field, principally in radio, television, and motion pictures. He had produced a number of motion pictures and over 300 television episodes. As president of FRP Productions, Rosenthal had provided production services and *448 completion bonds to producers, studios, and networks. Glass had been practicing law for 38 years in the entertainment law field and had experience in all activities relating to the motion picture and television fields and the theatre, including the representation of producers, distributors, writers, directors, and performers. Glass had also negotiated agreements with casts and directors, and negotiated distribution agreements, financing agreements, and acquisition agreements. Sharmat had been involved in arranging financing for over 400 plays, movies, and television shows and has lectured on the subject of film packaging and finance. The cast of "A Matter of Time" included Liza Minnelli, Ingrid Bergman, and Charles Boyer, all successful film stars at the time of the production. The director was Vincente Minnelli, an Academy Award-winning director, and the screenplay for the picture was by John Gay, a well-known screenwriter. Further, the estimated production budget at the time the Partnership was considering entering into the transaction was approximately $ 6,200,000. While the film did not prove to be successful in its eventual exploitation, it did generate distributor's domestic *449 gross receipts of $ 1,300,000 by December 30, 1983 and distributor's foreign gross receipts of $ 1,000,000 by August 31, 1977. This clearly demonstrates that significant efforts were made to produce a profit from the film. The experience level of the parties involved in the transaction, the distribution efforts actually made with respect to the film, and recognition that the motion picture industry is a high risk industry, lead us to the conclusion that the Partnership's acquisition of its participation in the net receipts from "A Matter of Time" was an activity engaged in for profit. The next issue for consideration relating to the partnership's investment in "A Matter of Time" is whether the partnership was entitled to an investment tax credit based upon its investment in the film. Sections 38 and 46 provide that a taxpayer is entitled to an investment tax credit with respect to certain "qualified investments." Section 48(k)(1) provides: (1) Entitlement to Credit. -- (A) In General. -- A credit shall be allowable under section 38 to a taxpayer with respect to any motion picture film or video tape -- (i) only if such film or tape is new section 38 property (determined without *450 regard to useful life) which is a qualified film, and (ii) only to the extent that the taxpayer has an ownership interest in such film or tape. (B) Qualified Film Defined. -- For purposes of this subsection, the term "qualified film" means any motion picture film or video tape created primarily for use as public entertainment or for educational purposes. Such term does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature. (C) Ownership Interest. -- For purposes of this subsection, a person's "ownership interest" in a qualified film shall be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film. Under section 48(k)(1)(C) a taxpayer's ownership interest in a qualified film is to "be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film." Section 1.48-8(a)(4)(i), Income Tax Regs., provides that in order for a taxpayer to have an ownership interest in qualified film, the taxpayer must have a depreciable interest in at least some part of the film. Section *451 1.48-8(a)(4)(iii), Income Tax Regs., provides that a taxpayer who, "at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof" is to be treated as having a depreciable interest for purposes of the investment tax credit if such taxpayer "can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film." The Partnership paid $ 1,290,000 to purchase a participation in the gross receipts from "A Matter of Time" and was at risk for this amount, being able to look for repayment of such amount "only to the proceeds generated from the exhibition or disposition of at least a part of the film." Therefore, petitioners are entitled to claim their proportionate share of investment tax credit from AIP's investment in "A Matter of Time." This credit is available in the year in which the film was first placed in service. Sec. 1.48-8(a)(1), Income Tax Regs. "A Matter of Time" was released for theatrical distribution on October 8, 1976 and was thus placed in service in 1976. Nevertheless, respondent contends that the *452 Partnership was not entitled to an investment tax credit because (1) the Partnership claimed that the useful life of the film was less than three years, and (2) petitioners have not established the amount of the production costs which were "qualified United States production costs." Section 48(a)(1) and section 1.48-1(a), Income Tax Regs., provide that in order for property to be section 38 property, such property must have a useful life of at least three years. On its returns, the Partnership claimed a useful life for depreciation purposes of 2 1/2 years. Section 48(k)(1)(a) and section 1.48-8(a)(1), Income Tax Regs., however, specifically state that the status of films and video tapes as new section 38 property is to be "determined without regard to useful life." As such, the Partnership's claim of a 2 1/2 year useful life with respect to the film does not bar it from claiming an investment tax credit. Section 46(c)(1) generally provides that a taxpayer's "qualified investment" for investment tax credit purposes is the "applicable percentage" of the basis of section 38 property placed in service during the year by the taxpayer. Section 48(k)(4), however, provides that "in determining *453 qualified investment under section (c)(1), there shall be used (in lieu of the basis of the property) an amount equal to the qualified United States production costs (as defined in paragraph (5))." Section 48(k)(5)(A) provides: (A) In General. -- For purposes of this subsection, the term "qualified United States production costs" means with respect to any film -- (i) direct production costs allocable to the United States, plus (ii) if 80 percent or more of the direct production costs are allocable to the United States, all other production costs other than direct production costs allocable outside the United States. The Partnership claimed qualified United States productions costs of $ 3,000,000 with respect to "A Matter of Time." Petitioners have placed in evidence a statement of costs with respect to the film which was prepared by Price, Waterhouse & Co., dated April 7, 1977. The trial balance attached to this statement shows the costs related to the film in four categories: (1) "COST IN ITALY Italian lire," (2) "COST IN ITALYU.S. dollars," (3) "COST IN U.K. Sterling," and (4) "COST IN U.S. U.S. dollars." The sum of the categories listing costs in dollar amounts is $ 2,982,537. *454 This is apparently petitioners' basis for claiming that the qualified United States production costs were $ 3,000,000. However, $ 522,336 of this amount is shown as "COST IN ITALY" and we read this as meaning Italian expenses which were paid in dollar amounts. As such, we find the amount of the qualified United States production costs were $ 2,430,201. [29]
Production Service Agreements
On its 1975 and 1976 returns, the Partnership showed as current business expenses the amounts paid as production expenses with respect to the three production service films, including amounts paid from the proceeds of the loans from Ban of America and Harlene. The Partnership also deducted interest payments of $ 6,755 in 1975 and $ 274,429.12 in 1976 made to Bank of America with respect to the loans. The *455 Partnership reported interest income in the amounts of $ 10,838.82 in 1975 and $ 270,345.09 in 1976. Petitioners contend that the above expenses were paid by the Partnership pursuant to the production service agreements and that such amounts were properly deductible as current business expenses. Petitioners argue that the Partnership's performance of the production service agreements was bona fide and that the Partnership had a substantial business function in the production of the films. Conversely, respondent contends that the Partnership's sole business function with regard to the production service films was to provide additional financing for the production of the films and that the Partnership did not incur the expenses of production. Because we find that the Partnership neither performed production services nor incurred the expenses of producing the films, we hold that the Partnership may not take current business deductions for the costs of producing the films. In each of the production service agreements the Partnership agreed to provide to Wetherly "all functions necessary to prepare a negative of the [film] * * * [which] shall include but not be limited to the *456 following services: all studio facilities and services, writing and directing services, production supervision services, services of actors and actresses, photography, sound, mixing, editing and music." In return, AIP was to pay the Partnership a total contract price consisting of fixed payments and contingent payments. The payments to be made to the Partnership pursuant to the production service agreements, when considered in light of the distribution agreements entered into between Wetherly and AIP, can be broken down into three categories: (1) fixed payments made to cover loans from Bank of America and Harlene; (2) payments made to the extent of the Partnership's cash investment; and (3) payments made in excess of the above amounts. The fixed payments to be made by Wetherly exactly equaled the loans from Bank of America and Harlene in each case. [30] These payments were to be paid out of a fixed percentage of the amounts received by Wetherly from AIP pursuant to the distribution agreements, but in all events were to be paid by a set date, i.e., Wetherly's obligation to pay was fully recourse. *457 After the above amounts had been paid, Wetherly was to pay the Partnership a fixed sum from 100 percent of all amounts received by Wetherly pursuant to the distribution contracts. In each case, this fixed sum equaled the difference between the film's production budget and the amount of the loans from Bank of America and Harlene, i.e., the amount of the production budget which the Partnership would be required to invest. [31] The distribution contracts provided for Wetherly, at this stage, to receive 100 percent of the net producer's share of gross receipts, except that AIP could retain a percentage of such amounts to the extent it had previously been required to pay guaranteed payments of net producer's share of gross receipts. Finally, after payment of both of the *458 above described amounts, the Partnership was to receive a percentage of net profits from the film ranging from 9.412 percent to 10.95 percent, until the sum of such payments and the above described amounts equaled the total contract price set forth in the production agreements. In Estate of Helliwell v. Commissioner,77 T.C. 964 (1981), we dealt with a motion picture production service partnership arrangement in some respects similar to the partnership arrangement here in issue. We noted in that case that: The concept of the motion picture production service partnership was developed as a means of providing a financing for the large "up-front" costs of producing a film by subsidizing such a venture through a hoped-for immediate write-off of the costs of producing a film. It was contemplated that such tax benefits would be augmented through the use of nonrecourse loans, thereby allowing a limited partner to increase his basis and, thus, the amount of losses he could currently deduct. See secs. 704(d), 705, 722, 752(a); sec. 1.752-1(e), Income Tax Regs. Such loans would be secured by the distribution contract with a distributor. As compensation for its services, *459 the service partnership would be paid a fee, which would be payable in installments, and which, at least in part, would be contingent on the commercial success of the film. Thus, the hoped-for tax benefits would come through the large "up-front" deduction of the film's expenses, a deferral of the recognition of income, and if the film was a commercial success, a profit to the investors. See generally Kanter & Eisenberg, "What Alice Sees Through the Looking Glass When Movieland Seeks Creative Techniques for Financing Films," 53 Taxes 94, 99-102 (1975); S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 109-117. In theory, the production service partnership could be a valid business arrangement. However, as in the case of any business arrangement, it must be scrutinized to ascertain whether its form comports with economic reality. See Commissioner v. Court Holding Co.,324 U.S. 331 (1945); Gregory v. Helvering,293 U.S. 465 (1935); Weiss v. Stearn,265 U.S. 242 (1924). The structure of the arrangements reflects exceptional ingenuity and imagination, but as a court, we must not be beguiled by such ingenuity -- we must *460 pursue the "paper chase" to ferret out the substance of the arrangements to determine the proper tax treatment. United States v. General Geophysical Co.,296 F.2d 86, 87 (5th Cir. 1961), cert, denied 369 U.S. 849 (1962). [77 T.C. at 982-983; Fn. ref. omitted.] A production service company is a company that supply necessary personnel, equipment, and expertise to a product to effectuate the filming of a movie. The services commonly rendered by such companies include: (1) making arrangements acquire permits to allow filming on location; (2) providing staging facilities; (3) making arrangements with labs where film is to be developed; (4) making arrangements with prop and costume companies; (5) examining the script, budget, and shooting schedule to determine whether the film has been properly budgeted; (6) providing payroll services for the producer; and (7) arranging insurance for the producer. The record in this case demonstrates that AIP, not the Partnership, controlled the production of the films. Virtually all of the contracts and agreements relating to the films were negotiated by employees of AIP or independent contractors chosen *461 by AIP. Some of these contracts were even executed by AIP employees, purportedly on behalf of the Partnership but without prior notice to the Partnership. When documents were executed by Rosenthal on behalf of the Partnership, the only evidence suggesting that Rosenthal gave any consideration to the content of the documents is his testimony that he "reviewed" the documents before executing them. While the Partnership was signatory to the guild and union agreements and employer of record for purposes of payroll taxes, workers' compensation, and disability insurance, the record establishes that Brown, the production controller for AIP, made the arrangements which allowed the Partnership to obtain such status. Further, AIP was responsible for making all disbursements for production services relating to the movies and controlling the budgets. AIP negotiated and arranged for all insurance coverage and claims for the three production service movies. AIP negotiated for the contracts with actors which were entered into by the Partnership. With respect to the movie "Futureworld," AIP employees also negotiated filming locations, musical arrangements, and services of the director of photography, *462 and AIP was required to guarantee the Partnership's performance in order to induce some of the actors and actresses to agree to provide services for "Futureworld." Former employees of AIP, allegedly acting as independent contractors, were the production accountants for each of the films and were supervised by Brown, the production controller for AIP. Brown arranged for the bank accounts which were used to pay the expense relating to the production of the films. Each of these accounts required the signatures of two individuals from a specified group. Brown was one of the authorized co-signatories on all three of the accounts, while Rosenthal was listed as an authorized signatory on only two of the accounts. The other authorized signatories were either employees of AIP or were independent contractors involved with the production of the films. Rosenthal, in fact, did not sign any of the checks drawn on these accounts. Based on all of the above, we find that the Partnership neither performed the services which a bona fide production services company performs nor incurred the expenses which it has attempted to deduct. The record establishes that AIP controlled the production of *463 the films and that employees of AIP and/or independent contractors chosen by AIP controlled the funds used to pay for the production of the films. The Partnership merely provided financing for the production of the films. Accordingly, the Partnership is not entitled to deduct as current business expenditures the amounts expended for production of the films. Again, however, the Partnership has acquired intangible contractual rights which we believe are bona fide rights worthy of recognition for Federal income tax purposes. The allocation of receipts from the exploitation of the film in excess of breakeven is again indicative of the parties' ownership interests in the film. The production service agreements provided the Partnership with limited interests in the receipts from the distribution of the films, while AIP retained complete control over the exploitation of the films. We conclude that the Partnership purchased limited interests in the net receipts from the exploitation of the films. We do not find these interests wholly lacking in economic substance so as to require that they be disregarded for Federal tax purposes. See Falsetti v. Commissioner, supra. *464 These intangible contractual rights to net receipts from exploitation of the films are depreciable interests. Durkin v. Commissioner, supra;Tolwinsky v. Commissioner, supra. After the loans from Bank of America and Harlene were paid, these rights consisted of the right to (1) recoup the Partnership's cash investment in the films from 100 percent of the net producer's share of gross receipts generated by the exploitation of the films and (2) thereafter, to participate in a percentage of the profits generated by exploitation of the films ranging from 9.412 to 10.95 percent until such time as the Partnership had received an amount roughly equal to 3 1/2 times its cash investment. The contractual terms in this situation have set the maximum amount of income which the Partnership can receive from the intangible rights. Further, it does not appear that the value of these rights would bear an ascertainable relationship to the period of time for which they are held. As such, these interests are peculiarly well suited to being depreciated by use of the income-forecast method. [32]
*465 In depreciating each of the intangible contractual rights, the Partnership may not include the amount of the Bank of America and Harlene loans in its depreciable bases. The Partnership's alleged obligations to Bank of America and Harlene were completely nonrecourse. The fixed payments to be made by Wetherly to the Partnership exactly equaled the loans from Bank of America and Harlene in each case. These payments were to be paid out of a fixed percentage of the amounts received by Wetherly from AIP pursuant to the distribution agreements, but in all events were to be paid by a set date, i.e., Wetherly's obligation to pay these amounts to the Partnership was fully recourse. The amount of the fixed payments included interest at the rate of 1 percent over the prime rate charged by the Bank of America, plus a surcharge equal to 20 percent of such interest. Interest on both the Bank of America and Harlene loans accrued at a rate of 1 percent over the prime rate charged by Bank of America. Pursuant to the distribution agreements, AIP guaranteed that Wetherly would receive net producer's share of gross receipts equal to the amount of the loans from Bank of America plus interest at *466 120 percent of the rate charged AIP by the Bank of America. This arrangement guaranteed that Wetherly would receive producer's share of gross receipts equal to at least the amounts necessary to pay the Bank of America loans, including interest. In each case, Wetherly assigned the right to guaranteed net producer's share of gross receipts to Bank of America. Bank of America had no credit relationship with the Partnership and looked to AIP's line of credit when making the loans to the Partnership in connection with the production of the three production service films. Bank of America looked to AIP for repayment of the loans as a result of the completion guarantees, the assignment of rights under the distribution and production services agreements, and the fact that the Partnership's obligation was completely nonrecourse. AIP delivered the checks of the Partnership in payment of the loans. Bank of America had no relationship with the Partnership prior to or after the three loans relating to the production service films. Based on the above, the loans from Bank of America and Harlene were clearly obligations of AIP rather than the Partnership. Accordingly, the Partnership may not *467 include the amount of these loans in the bases of the intangible contractual rights it acquired with respect to the exploitation of the films. The Partnership deducted interest payments of $ 6,755 in 1975 and $ 274,429.12 in 1976 made to Bank of America with respect to the loans secured to cover the production costs of the three production service films. The Partnership also reported interest income in the amounts of $ 10,838.82 in 1975 and $ 270,345.09 in 1976. These interest income amounts represent the interest payments made by AIP/Wetherly on the loans from Bank of America. [33] As we have held that the obligations represented by these loans were obligations of AIP rather than the Partnership, the Partnership is not entitled to deduct the interest paid on these loans. Similarly, the Partnership is not required to report interest income as a result of the payment of these loans by AIP/Wetherly. The Partnership also cannot take this interest income into account in applying the income-forecast method of depreciation to its intangible contractual rights. [34]
*468 We next consider whether the Partnership's investment in the exploitation of the production service films was an activity not engaged in for profit. This determination must be made based upon a consideration of all facts and circumstances. Sec. 1.183-2(b), Income Tax Regs.; Jasionowski v. Commissioner, supra.After a thorough review of the record, we believe that the Partnership's participation in the exploitation of the production service films was an activity engaged in for profit. As we have previously stated, Rosenthal, Glass, and Sharmat were all experienced in the motion picture industry. Rosenthal had 35 years of experience in the entertainment field, principally in radio, television, and motion pictures. Glass had been practicing law for 38 years in the entertainment law field and had experience in all activities relating to the motion picture and television fields and the theatre, including the representation of producers, distributors, writers, directors, and performers. Sharmat had been involved in arranging financing for over 400 plays, movies, and television shows and has lectured on the subject of film packaging and finance. The three pictures *469 with respect to which the Partnership executed the production service agreements were: (1) "Friday Foster," a picture starring Pam Grier and produced by Arthur Marks; (2) "Food of the Gods," based on an H. G. Wells story and produced by Bert Gordon; and (3) "Futureworld," featuring Yul Brynner, Peter Fonda, and Blythe Danner, and produced by James Aubrey and Paul Lazarus as a sequel to the successful science fiction film "Westworld." The experience level of the parties involved in the transaction, the nature of the productions, and recognition that the motion picture industry is a high risk industry, lead us to the conclusion that the Partnership's acquisition of its participation in the net receipts from the production service films was an activity engaged in for profit. The production service agreements, like the purchase agreement with respect to "A Matter of Time," created a situation in which the Partnership had provided funding for the production of the films prior to the time the films were first placed in service. The Partnership could look for repayment of these amounts "solely to the proceeds generated from the exhibition or disposition of at least a part of the film. *470 " See sec. 1.48-8(a)(4)(iii), Income Tax Regs. The Partnership, therefore, held an "ownership interest" with respect to each of the films within the meaning of section 48(k)(1). Further, each of these films were "created primarily for use as public entertainment," and are new section 38 property which are qualified films. Sec. 48(a)(1), (b), (k)(1)(B). The Partnership is, therefore, entitled to claim investment tax credits to the extent of its pro rata contribution to the qualified United States production costs incurred in producing the films. The films "Friday Foster" and "Futureworld" were produced solely in the United States and had production budgets of $ 960,000 and $ 3,001,000, respectively. The Partnership provided production financing for "Friday Foster" in the amount of $ 210,250 and for "Futureworld" in the amount of $ 588,700. We find the qualified United States production costs with respect to these two films to be the amount of their production budgets and hold that the Partnership is entitled to claim investment tax credits based on the amounts of production financing it provided. "Food of the Gods" was primarily filmed on Bowen Island, Canada and had a production *471 budget in the amount of $ 1,483,250. The Partnership provided production financing for "Food of the Gods" in the amount of $ 279,212. The record does not establish what part, if any, of the production budget represents qualified United States production costs. Accordingly, petitioners are not entitled to claim a pro rata share of an investment tax credit with respect to "Food of the Gods." Rule 142(a).
Miscellaneous Deductions
On its Form 1065, U.S. Partnership Return of Income, for the taxable year 1975 the Partnership's claimed deductions included (1) $ 26,000 as payments to the general partner and (2) $ 638.82 for stationery and printing. On its U.S. Partnership Return of Income for the taxable year 1976 the Partnership's claimed deductions included (1) $ 1,802.60 for administrative expenses, (2) $ 4,576.63 for service fees and (3) interest expenses consisting of $ 12,993.15 paid to the Bank of Raleigh, and $ 22,012.07 paid to Citibank. Respondent alleges that the payments to the partners, administrative expenses, and service fees have not been shown by petitioners to be amounts which were not in the nature of syndication expenses or, in the alternative, organizational *472 expenses. Respondent also contends that petitioners have failed to show that the Partnership had an indebtedness to either the Bank of Raleigh or Citibank and that, therefore, no deduction is allowable under section 163(a). For a partnership to be able to deduct a guaranteed payment, the payment must satisfy the requirements of section 162(a), and the provisions of section 263 [35] must be taken into account. Sec. 1.707-1(c), Income Tax Regs.; Estate of Boyd v. Commissioner,76 T.C. 646, 660 (1981); Cagle v. Commissioner,63 T.C. 86, 94 (1974), affd. 539 F.2d 409 (5th Cir. 1976). [36] Section 162(a) generally provides a deduction for "all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Any portion of an expense which is attributable to organizing and setting up the partnership is not deductible and the nature of the expense, as opposed to the designation or treatment given it by the partnership, is controlling with respect to this issue. Estate of Boyd v. Commissioner, supra at 657, 666; Cagle v. Commissioner, supra at 96. The taxpayer *473 must establish the portion of the fee allocable to deductible expenditures. Rule 142(a); Estate of Boyd v. Commissioner, supra at 658. This allocation of the guaranteed payment must reasonably comport with the value of the services performed. Wildman v. Commissioner,78 T.C. 943, 958 (1982). *474 A review of the record in this case convinces us that the payment in the amount of $ 26,000 deducted by the partnership was in the nature of a syndication expense which must be capitalized. The private placement memorandum provided that the general and Class A limited partners were to be paid an initial fee of $ 582,875 from which they were to pay (1) expenses and fees incurred in connection with establishing and administering the Partnership, negotiating contracts covering the Partnership's initial projects, and arranging the private placement, (2) fees and expenses of discounting letters of credit, and (3) selling fees paid to others assisting in the sale of units. The balance was to be retained by the general and Class A limited partners as compensation for services rendered to the Partnership. The general and Class A limited partners were also to receive a percentage of the Partnership's cash-flow in excess of the percentages of capital contributed to the Partnership by them. The guaranteed payment was an initial fee to be paid in the year of organization and syndication, and additional fees were to be paid to the general and Class A limited partners in the form of increased *475 percentages of the Partnership's net cash-flow. Further, the payment was to be taken out of an amount set aside primarily for start up and syndication costs, thereby suggesting that the amounts paid to the general and Class A limited partners were, at least in part, to be compensation for their services in organizing the Partnership and syndicating interests in the Partnership. Petitioners have failed to establish that any portion of the guaranteed payment was other than a syndication expense. On its return for 1975, the Partnership claimed a deduction for stationery and printing expenses in the amount of $ 638.82 and on its return for 1976 it claimed deductions for administrative expenses in the amount of $ 1,820.60 and service fees in the amount of $ 4,576.63. Respondent argues that petitioners have failed to establish the purpose for which these expenses were incurred. The only evidence offered with respect to the stationery and printing expenses was the testimony of Thomas McLaughlin, wherein he stated that the expenses were incurred in connection with the Partnership's private placement memorandum. Such expenses are therefore syndication expenses of the Partnership and are *476 not deductible. Estate of Boyd v. Commissioner, supra.
The only evidence offered with respect to the administrative expenses and service fees was also the testimony of Thomas McLaughlin. He testified that the claimed administrative expenses represented expenses for traveling in connection with Partnership business and for fees paid to banks in connection with the partners' letters of credit. This testimony did not establish any specific information with respect to the items for which the claimed administrative expenses were incurred. Further, Thomas McLaughlin testified only that the service fees were payments made to the general and Class A limited partners in accordance with the private placement memorandum. This testimony did not identify the nature of the services which were performed in exchange for the payments. The evidence presented is insufficient to overcome the presumption of correctness which attaches to respondent's determination that such amounts are not allowable pursuant to section 709(a). [37] See Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Accordingly, petitioners are not entitled to deduct any portion of these *477 claimed expenses. With respect to the interest payments of $ 12,993.15 made to the Bank of Raleigh and $ 22,012.07 made to Citibank, respondent contends that petitioners have not established the existence of loans from these banks to the Partnership and that therefore petitioners are not entitled to deduct these amounts as interest. Respondent stipulated that payment of the $ 22,012.07 amount had been substantiated. Further, petitioners have placed in evidence a letter on Citibank letterhead showing interest paid during 1976 in the amount of $ 22,012.07 by the Partnership on a loan from Citibank. We find that petitioners have established that a loan from Citibank to the Partnership existed in 1976 and that the Partnership paid interest in the amount of $ 22,012.07 on such loan during 1976. Petitioners have also placed in evidence correspondence from Daniel Glass on behalf of the Partnership, James B. Arnoff of the law firm of Migdal, Tenney, Glass & Pollack, and J. R. Carr, the executive vice president of the Bank of Raleigh, showing that the Bank of Raleigh discounted *478 a $ 200,000 letter of credit for the Partnership in 1976. The amount of the discount was $ 12,993.15 which represented interest calculated at 8-3/4 percent for the period from April 13, 1976 to January 9, 1977, the due date on the letter of credit. Also placed in evidence is a copy of a cashier's check payable to the Partnership dated April 13, 1976 from the Bank of Raleigh in the amount of $ 187,006.85. We find that the evidence introduced by petitioners is sufficient to establish that the Partnership incurred interest in the amount of $ 12,993.15 which was paid to the Bank of Raleigh in 1976. Accordingly, petitioners are entitled to deduct their shares of the Partnership's claimed 1976 interest deductions in the amounts of $ 22,012.07 and $ 12,995.15. Section 6621(c)
Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to a "substantial underpayment" (defined as an underpayment in excess of $ 1,000) attributable to a tax-motivated transaction. Section 6621(c)(3)(A) enumerates types of transactions which are to be considered "tax motivated transactions." These transactions include "(i) any valuation overstatement (within *479 the meaning of section 6659(C)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle * * *, (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudulent transaction." Sec. 6621(c)(3)(A). The Treasury has promulgated temporary regulations which prescribe accounting methods "which may result in a substantial distortion of income." See sec. 301.6621-2T, Q&A-3, Proced. & Admin. Regs., T.D. 7998, 49 Fed. Reg. 50391 (Dec. 28, 1984); 1985-1 C.B. 368. These regulations provide, in relevant part: Q-3. What accounting methods may result in a substantial distortion of income for any period under [section 6621(c)(3)(A)(iv)]? A-3. A deduction or credit disallowed, or income included, in any of the circumstances listed below shall be treated as attributable to the use of an accounting method that may result in a substantial distortion of income and shall thus be a tax motivated transaction that results in a tax motivated underpayment: * * * (4) Any *480 deduction disallowed for any period under section 709, relating to organization or syndication expenditures of a partnership; * * * (9) In the case of a taxpayer who computes taxable income using the cash receipts and disbursements method of accounting, any deduction disallowed for any period because (i) the expenditure resulting in the deduction was a deposit rather than a payment, (ii) the expenditure was prepaid for tax avoidance purposes and not for a business purpose, or (iii) the deduction resulted in a material distortion of income * * *. Our first consideration in determining the applicability of the provisions of section 6621(c) is to determine which of the deductions and credits claimed by petitioners, if any, were the result of tax motivated transactions within the meaning of section 6621(c)(3)(A). In addition to a partial disallowance of the Partnership's claimed investment tax credit with respect to "A Matter of Time," we have disallowed the following deductions claimed by the Partnership: Year
Amount
Characterized by the Partnership as
1975
$   415,125.000 Interest paid to Productions
1975
3,835,880.25 Production service expenses
1975
6,754.79 Interest paid to Bank of America
1975
26,000.00 Payments to partners
1975
638.82 Stationery and printing expenses
1976
135,000.00 Interest paid to Productions
1976
2,760,000.00 Amortization of "A Matter of Time"
1976
3,573,870.92 Production service expenses
1976
274,429.12 Interest paid to Bank of America
1976
1,802.60 Administrative expenses
1976
4,576.63 Service fees
*481 The partnership claimed depreciation and an investment tax credit for its interest in "A Matter of Time." For purposes of depreciation the partnership claimed a basis in the film of $ 7,500,000. We determined that the Partnership's basis in its interest with respect to the film was $ 1,290,000. Section 6659(c) provides that "there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Here, the Partnership claimed on its return a basis for its interest in the film which exceeds the amount that we have determined to be the correct amount by approximately 580 percent. [38] Accordingly, the disallowance of the claimed amortization of "A Matter of Time" was attributable to a tax motivated transaction. *482 We have determined that the partnership was entitled to claim a part of the investment tax credit available with respect to the film based upon the qualified United States production costs of $ 2,430,201 and the ratio of the cash invested in the film by the Partnership over the film's production budget. These figures allow the Partnership to claim its share of qualified United States production costs as $ 505,639. The Partnership claimed qualified United States production costs of $ 3,000,000 for purposes of calculating its investment tax credit. As we have discussed supra, the amount of an investment tax credit with respect to a film is dependent upon qualified United States production costs rather than basis. Compare sec. 48(k)(4) and sec. 46(c)(1). As such, we cannot say that the Partnership's overstatement of its investment tax credit is a result of its overstatement of basis in the film. Further, neither section 6621(c) nor the temporary regulations specify the overstatement of qualified United States production costs as a tax motivated transaction. See sec. 6621(c)(3) and sec. 301.6621-2T, Temporary Proced. & Admin. Regs. We therefore hold that the Partnership's claim *483 of an investment tax credit in excess of the amount it was entitled to was not the result of a tax motivated transaction. We disallowed the Partnership's claimed deductions for interest paid to Production in 1975 and 1976 in the amounts of $ 415,125 and $ 135,000, respectively, because we found that the nonrecourse debt underlying such interest was not a bona fide debt. Section 6621(c)(3)(A) lists as one category of tax motivated transactions "any sham or fraudulent transaction." We believe that a holding that a debt is not a bona fide debt is indistinguishable from a holding that such a debt is a sham. [39] Accordingly, we hold that these claimed interest deductions were the result of tax motivated transactions. The disallowance of interest paid to Bank of America and Harlene with respect to the production service loans was based on a finding that the loans were not obligations of the Partnership. Similar to the claiming of interest deductions based upon a debt which is not a bona fide debt, we view the claiming *484 of interest deductions by a taxpayer based upon a debt which is not a debt of the taxpayer to be a sham transaction. The disallowance of these interest deductions is therefore also attributable to a tax motivated transaction pursuant to section 6621(c)(3)(A)(v). The next item disallowed was the claimed deduction for the payments allegedly made for production service expenses. This amount was disallowed because the alleged payments were found to actually be in the nature of financing rather then expenditures incurred for the production of the films. In substance, the production service agreements were an attempt to use the cash method of accounting to create up-front deductions for amounts which were actually financing. See Estate of Helliwell v. Commissioner, supra at 982-983. This arrangement is an attempt to use the cash receipts and disbursements method of accounting to create a material distortion of income. Section 301.6621-2T, Q&A-3(9), Temporary Proced. & Admin. Regs., [40] provides that, in the case of taxpayers using the cash receipts and disbursements method of accounting, deductions disallowed because "the deduction resulted in a material distortion *485 of income" are to be considered the use of an accounting method which may result in a substantial distortion of income within the meaning of section 6621(c)(3)(A)(iv). Such deductions are treated as resulting from tax-motivated transactions. We recognize that our stated basis for disallowing the Partnership's claimed production expense deductions was that the Partnership neither produced the films nor incurred production expenses. We believe, however, that the facts leading to this conclusion are so integrally related to the Partnership's attempt to create a distortion of income that the two holdings are inseparably related. Accordingly, we find that the disallowance of this deduction resulted from the use of an accounting method which may result in a substantial distortion of income within the meaning of Temporary Proced. & Admin. Regs., section 301.6621-2T, Q&A-3(9)(iii). The underpayment resulting from such disallowed deduction is therefore attributable to a tax motivated transaction. The temporary regulations provide that a transaction resulting in *486 any deduction "disallowed for any period under section 709, relating to organization or syndication expenditures of a partnership" is to be considered the use of an accounting method which may result in a substantial distortion of income within the meaning of section 6621(c)(3)(A)(iv), and therefore a tax motivated transaction. Section 301.6621-2T, Q&A-3(4), Temporary Proced. & Admin. Regs. The deductions taken by the Partnership for administrative expenses and service fees were disallowed pursuant to section 709(a) because of petitioners' failure to establish that such expenditures were not syndication expenses. Such deductions, therefore, squarely fall within the provisions of the temporary regulations and are to be treated as resulting from a tax motivated transaction. The Partnership's 1975 deductions for payments to partners in the amount of $ 26,000 and stationery and printing expenses in the amount of $ 632.82 were also disallowed due to petitioners' failure to establish that such amounts were not syndication expenditures. Section 709(a), however, was not applicable for the year such deductions were claimed. See n. 35, supra. As no other provision exists which would *487 categorize these amounts as resulting from tax motivated transactions, we find that the underpayment attributable to the disallowance of these deductions is not an underpayment attributable to a tax motivated transaction. The underpayments resulting from the disallowance of deductions which we have found to be the result of tax motivated transactions are in excess of $ 1,000 with respect to each petitioner and are therefore substantial within the meaning of section 6621(c)(2). Accordingly, petitioners are subject to the increased rate of interest on the portion of the underpayments attributable to tax motivated transactions. Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended, and in effect for the years in issue. Former section 6621(d) was redesignated as section 6621(c) pursuant to section 1511(c), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended. ↩
2. The law firm of Midgal, Tenney, Glass & Pollack was paid $ 137,601 by the Partnership in 1975. ↩
3. AIP was not actually a party to the agreement, but the distribution rights received by AIP were granted to Productions under the condition that Productions in turn grant such rights to AIP. ↩
4. The domestic markets were defined as the United States and Canada and the foreign markets were defined as all others. ↩
5. A production service agreement (see supra↩) had been entered into by the parties and it appears that the $ 6,200,000 amount was to be paid to the production service company pursuant to this agreement. 6. The production service agreement entered into with respect to "A Matter of Time" which entitled another entity to 10.5 percent of available domestic receipts and available foreign receipts. This entitlement was to be deducted 50 percent from GIF's share of such receipts, 25 percent from Production's share, and 25 percent from Oceania's share. ↩
7. As a related matter, AIP paid a financing fee in the amount of $ 120,000 to Creative Arts Development Establishment for securing the financing from the Partnership. ↩
8. Productions did not treat either of these amounts as interest, but rather treated the amounts as a reduction of its basis in the movie. ↩
9. The note stated that the payee acknowledged receipt of interest for the period from the date of the note through December 14, 1976, and that interest for the period from December 15, 1976 through April 14, 1977 was due on or before July 30, 1976. Rosenthal was the only party to sign the note. ↩
10. The letter was sent on AIP letterhead which included a preprinted statement that "No agreement will be binding on this corporation unless in writing and signed by a corporate officer." ↩
11. Wetherly appears to be a corporation which is either controlled by AIP or controlled by the same principals as AIP. The record is not clear as to their relationship, but the two corporations share the same business address and documents executed on behalf of Wetherly were executed by M. Morton Siegel, assistant secretary of AIP, as assistant secretary of Wetherly.↩
12. Interest was to be calculated at 120 percent of the rate charged by AIP's principal bank lender, i.e., Bank of America. ↩
13. While stated in the agreement in this somewhat complicated three part form, it would appear that the net effect of this provision was to call for AIP to recoup any guaranteed payments previously made to Wetherly (plus interest) from 78.1 percent of producer's share of gross receipts, and for all other producer's share of gross receipts to be paid to Wetherly. ↩
14. Interest was to be calculated at 1 percent over the prime rate charged by the Bank of America National Trust and Savings Association, plus a surcharge equal to 20 percent of such amount. ↩
15. The initial installment was to be equal to 78.1 percent of the amounts paid to Wetherly by AIP up to that time pursuant to the distribution agreement. ↩
16. Interest was to be calculated at 120 percent of the rate charged by AIP's principal bank lender. ↩
17. The net effect of this provision was to call for AIP to recoup any guaranteed payments previously made to Wetherly (plus interest) from 77.62 percent of producer's share of gross receipts, and for all other producer's share of gross receipts to be paid to Wetherly. ↩
18. Interest was to be calculated at 1 percent over the prime rate charged by the Bank of America National Trust and Savings Association, plus a surcharge equal to 20 percent of such amount. ↩
19. The initial installment was to be equal to 81.175 percent of all amounts previously paid to Wetherly by AIP pursuant to the distribution agreement. ↩
20. Interest was to be calculated at 120 percent of the rate charged by AIP's principal bank lender. ↩
21. The net effect of this provision was to call for AIP to recoup any guaranteed payments previously made to Wetherly (plus interest) from 76.67 percent of producer's share of gross receipts, and for all other producer's share of gross receipts to be paid to Wetherly. ↩
22. Interest was to be calculated at 1 percent over the prime rate charged by the Bank of America National Trust and Savings Association, plus a surcharge equal to 20 percent of such amount. ↩
23. The initial installment was to be equal to 80.4 percent of all amounts previously paid to Wetherly by AIP pursuant to the distribution agreement. ↩
24. Oceania apparently defaulted on its obligations beginning sometime in 1977. As of August 31, 1977, approximately $ 1,000,000 in distributor's gross receipts had been earned. By late 1979 the Partnership had brought suit in Italy against Giulio Sbargia, Oceania, Coralta, and Banca Nazionale del Lavoro S.A.C.C. ↩
25. See Isenberg v. Commissioner,T.C. Memo. 1987-269; Vandenhoff v. Commissioner,T.C. Memo. 1987-116↩. 26. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
27. We note that in Law v. Commisioner,86 T.C. 1065, 1104 (1986), and Tolwinsky v. Commissioner,86 T.C. 1009, 1053-1054↩ (1986), taxpayers with similar intangible contractual rights in films were permitted to use the straight-line method in depreciating such rights. In those cases, however, after first determining that the taxpayers therein were required to use the income forecast method of depreciating their rights, respondent conceded that the taxpayers could use the straight-line method of depreciation. Further, petitioners herein have not claimed the straight-line method of depreciation as an alternative to the sliding scale method they employed in reporting the transaction. 28. Section 461(g)(1), applicable to prepayments of interest after December 31, 1975, now provides that prepaid interest is generally not deductible prior to the taxable period during which it accrues. Pub. L. 94-455, sec. 208(b), 90 Stat. 1520, 1542. With respect to the deduction of prepaid interest paid prior to January 1, 1976, see Sandor v. Commissioner,62 T.C. 469 (1974), affd. 536 F.2d 875↩ (9th Cir. 1976). 29. Because we have held that the Partnership did not actually own the film but did have an "ownership interest" in the film, the Partnership is only entitled to an investment tax credit based upon a portion of the qualified United States production costs equal to the Partnership's investment in the film over the total production cost for the film, i.e., $ 1,290,000 over $ 6,200,000. ↩
30. These amounts were as follows: Friday Foster
Food of the Gods
Futureworld
Bank of America loan
$ 749,750
$ 1,151,000
$ 2,301,000
Harlene loan
--     52,788    111,300↩
TOTAL
$ 749,750
$ 1,203,788
$ 2,412,300
Fixed payments
$ 749,750
$ 1,203,788
$ 2,412,300
31. These amounts were as follows: Friday Foster
Food of the Gods
Futureworld
Production budget
$ 960,000
$ 1,483,250
$ 3,001,000
Less:
Bank of America loan
749,750
1,151,000
2,301,000
Harlene loan
--     52,788    111,300↩
TOTAL
$ 210,250
$   279,462
$   588,700
Fixed sum
$ 210,250
$   279,212
$   588,700
32. In this regard, however, the only element of the anticipated income which must be forecasted is the interest element. As will be explained infra,↩ this interest income does not include interest received by the Partnership on the portions of the total contract price covering the loans from Bank of America and Harlene. 33. The difference in these amounts is apparently, attributable to the difference in timing between the Partnership's receipt of interest payments from AIP/Wetherly and its payment of interest to Bank of America as reported on its return. The figures resolve themselves, however, if the two years are combined: Interest Deductions
Interest Income
1975
$   6,755.00
$  10,838.82
1976  274,429.12  270,345.09↩
TOTAL
$ 281,184.12
$ 281,183.91
34. As to the film "Futureworld," neither party has cited sec. 280, which requires individuals to capitalize the production costs of motion pictures and certain other properties produced after 1975 and to amortize such costs under an income forecast method. Enacted as part of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, sec. 280 was aimed at the so-called production company shelter: a partnership which was formed to produce (but not own) a motion picture and which used the cash method of accounting and expensed the costs of production as they were paid; typically, the partnership was heavily leveraged, and significant costs were paid with borrowed funds. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 109-117; see, e.g., Estate of Helliwell v. Commissioner,77 T.C. 964↩ (1981). Without deciding the issue, we observe that sec. 280, on its face, appears not to apply to an income interest like the one purchased by the partnership here. 35. Section 263(a) generally provides that a payment made for a capital asset is not currently deductible even though it might otherwise be considered an ordinary and necessary business expense. ↩
36. Section 709 now provides: (a) General Rule. -- Except as provided in subsection (b), no deduction shall be allowed under this chapter to the partnership or to any partner for any amounts paid or incurred to organize a partnership or to promote the sale of (or to sell) an interest in such partnership. (b) Amortization of Organization Fees. -- (1) Deduction. -- Amounts paid or incurred to organize a partnership may, at the election of the partnership (made in accordance with regulations prescribed by the Secretary), be treated as deferred expenses. Such deferred expenses shall be allowed as a deduction ratably over such period of not less than 60 months as may be selected by the partnership (beginning with the month in which the partnership begins business), or if the partnership is liquidated before the end of such 60-month period, such deferred expenses (to the extent not deducted under this section may be deducted to the extent provided in section 165. (2) Organizational Expenses Defined. -- The organizational expenses to which paragraph (1) applies, are expenditures which -- (A) are incident to the creation of the partnership; (B) are chargeable to capital account; and (C) are of a character which, if expended incident to the creation of a partnership having an ascertainable life, would be amortized over such life. Section 709 was enacted as part of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1548. Section 213(f) of the Tax Reform Act of 1976 provides that section 709(a) is to be applicable to amounts paid in taxable years after December 31, 1975 and that section 709(b) is to be applicable to amounts paid in taxable years after December 31, 1976. ↩
37. Because these deductions were claimed for 1976, section 709(a) is applicable. See n. 35, supra.↩
38. We recognize that the Partnership claimed a basis in the film and that we determined that the Partnership had basis in only an intangible contractual right. However, analyzing the valuation overstatement from the perspective of the two property rights being different would require comparing the Partnership's claimed basis in the film to the Partnership's actual zero basis in the film and would therefore reach the same result. See Zirker v. Commissioner,87 T.C. 970↩ (1986). 39. Our holding that the purchase transaction in which the debt was created was not without economic substance does not alter the fact that the debt itself was a sham. ↩
40. These regulations were promulgated under the specific authority given the Secretary by section 6621(c)(3)(A)(iv). ↩